# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLA RADA, on Behalf of Herself and All Others Similarly Situated, | **Case No.:**   1:25-cv-10679 |
| Plaintiff,<br>v. | **CLASS ACTION COMPLAINT** |
| VERSANT MEDIA, LLC and E! ENTERTAINMENT TELEVISION, LLC | **JURY TRIAL DEMANDED** |
| Defendants. | |

Dated: December 23, 2025

Mark S. Reich (MR-4166)
Gary Ishimoto *
Christopher V. DeVivo (5969787)
Michael N. Pollack (6173272)
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: gishimoto@zlk.com
Email: cdevivo@zlk.com
Email: mpollack@zlk.com

*Counsel for Plaintiff*

*pro hac vice* forthcoming

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................. 2

    Wiretap Violations ....................................................................................................... 5

PARTIES .......................................................................................................................... 6

JURISDICTION AND VENUE ........................................................................................ 7

COMMON FACTUAL ALLEGATIONS ......................................................................... 8

   I.    Legislative Background ........................................................................................ 8

      A.   The Federal Wiretap Act ............................................................................... 8

      B.   The California Invasion of Privacy Act .................................................... 10

   II.   The Website and the Tracking Tools .................................................................. 12

      A.   The Trade Desk Pixel .................................................................................. 12

         i.   The Trade Desk benefits from the Website's use of the TTD Pixel ......................... 14

      B.   Defendants utilize comScore's ScorecardResearch system to monetize users' Search Terms ....................................................................................................... 16

      C.   Defendants Programmed the Website to Include the Tracking Tools ........................... 19

  III.  Defendants Falsely Informed Users That They Could Opt Out of the Website's Use of Cookies ....................................................................................... 22

  IV.  Plaintiff Did Not Consent to Defendants' Sharing of Plaintiff's Sensitive Information .. 27

  V.   Plaintiff Has a Privacy Right in their Search Terms ........................................... 27

INJUNCTIVE RELIEF OF DEFENDANTS' ONGOING WIRETAP VIOLATIONS ............. 28

TOLLING ........................................................................................................................ 29

CLASS ACTION ALLEGATIONS ................................................................................ 30

CAUSES OF ACTION .................................................................................................... 32

    COUNT I - VIOLATION OF THE FEDERAL WIRETAP ACT .............................. 32

    COUNT II - INTRUSION UPON SECLUSION ....................................................... 35

    COUNT III - VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ......... 37

    COUNT IV - VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ......... 39

    COUNT V - VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT ........................................................................................................... 41

    COUNT VI - VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ....... 42

PRAYER FOR RELIEF .................................................................................................. 46

DEMAND FOR TRIAL BY JURY ................................................................................ 47

i

Plaintiff Alla Rada ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her undersigned counsel, brings this class action complaint against Defendants Versant Media, LLC ("Versant") and E! Entertainment Television, LLC ("E! Entertainment" or "Defendants"). E! Entertainment owns and manages a website located at https://www.eonline.com (the "Website"), which provides users with access to online articles, photos, videos, and entertainment news.

## NATURE OF THE ACTION

1.    Courts have recognized that opaque digital tracking practices threaten consumer privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of a basic expectation of privacy in online activity. Companies often represent that users may control whether their data is sold, shared, or tracked. When data continues to be transmitted after those representations have been made, the conduct is improper.

2.    Versant Media, LLC, doing business as E! Entertainment Television, LLC, operates the Website, which allows users to browse entertainment-related articles, photos, videos, and news content. Like many modern websites, the Website displays a cookie banner and a "Your Privacy Choices" interface, referred to as the cookie settings, purporting to provide users with meaningful control over the data the Website shares with third parties. The banner assures users that they may control the sale or sharing of their personal information and opt out of personalized advertising.



*Figure 1 - The cookie banner as presented to users, representing that users may control the sale or sharing of personal information and opt out of personalized advertising*

3.      Defendants' assurances are false. Cookie-consent interfaces are deceptive and legally actionable where a website places and transmits Tracking Tools before users have an opportunity to interact with the cookie banner and continues transmitting user data to Tracking Entities even after users toggle off the sale or sharing of personal information and reject all non-essential cookies. See *Pemberton v. Rest. Brands Int'l, Inc.*, No. 25-cv-03647-JSC, 2025 U.S. Dist. LEXIS 230964 (N.D. Cal. Nov. 24, 2025). These practices constitute invasion of privacy, intrusion upon seclusion, and fraud. Misrepresenting the effectiveness of a cookie opt-out mechanism deprives users of control over their personal information and creates a concrete injury sufficient for Article III standing. The Website begins placing and transmitting cookies and other Tracking Tools immediately upon a user landing on any page, before the user can view or act upon the cookie banner. Even after users affirmatively toggle off the sale or sharing of personal information and reject all non-required cookies, the Website continues to deploy and transmit data via third-party tracking tools (the "Tracking Tools") to advertising and analytics companies (the "Tracking Entities"). Upon information and belief, these Tracking Entities include Google, Meta (also referred to as Facebook), and additional advertising technology partners whose

Tracking Tools, including cookies, track users' browsing history, Website interactions, inputs, device information, session data, and unique identifiers across the Website.

4.      The Website's cookie banner and preferences interface materially mislead users about the use and sale of their data. Defendants present users with purported privacy controls while enabling third parties to monitor users' online behavior in real time. As recognized in *Pemberton*, such conduct deprives users of control over their personal information and violates fundamental privacy protections.

5.      Plaintiff visited the Website at least once in 2024, in November, for example, to browse news, entertainment articles, and related digital content. She visited the site more recently in connection with the research associated with this case. Plaintiff clicked "Your Privacy Choices," toggled off the sale/sharing of personal information, and selected "Confirm My Choice." In reliance on Defendants' representations, Plaintiff believed the Website would honor these choices. Defendants nevertheless continued to transmit Plaintiff's browsing activity, page interactions, navigation patterns, and identifiers to the Tracking Entities for advertising and analytics purposes.

6.      Defendants' conduct allowed the Tracking Entities to unlawfully intrude into Plaintiff's Sensitive Information, private communications, invade Plaintiff's fundamental right to privacy, and fraudulently misrepresented the Website's data-collection practices. In doing so, Defendants violated California's Invasion of Privacy Act ("CIPA"), including Penal Code § 631 (illegal wiretapping) and § 638.51 (unlawful use of a pen register or trap and trace device); Florida Security of Communications Act § 934.01 and § 934.31 (unlawful use of a pen register or trap and trace device); as well as common-law prohibitions against invasion of privacy, intrusion upon seclusion, fraud and deceit, unjust enrichment, and related statutory and common-law protections.

Plaintiff brings this action on behalf of herself and a class of similarly situated users harmed by Defendants' deceptive and unlawful surveillance practices.

### *Wiretap Violations*

7.     Federal and state legislatures have recognized and addressed individuals' privacy expectations in communications transmitted over wired and electronic systems.

8.     Congress enacted the Federal Wiretap Act to prohibit the unauthorized interception of electronic communications.

9.     California enacted the California Invasion of Privacy Act, which imposes civil liability on any person who, willfully and without the consent of all parties to a communication, attempts to read or learn the contents or meaning of any message or communication while it is in transit or passing over any wire, line, or cable, or while it is being sent from or received at any place within California.[1]

10.     CIPA also prohibits the installation of a pen register or a trap and trace device without first obtaining a court order.[2]

11.     Defendants implemented and utilized the Tracking Tools to intercept, read, disclose, and record Users' Sensitive Information. The Website does not provide notice of, or obtain consent for, these practices.

12.     Users of the Website, including Plaintiff, have an interest in maintaining control over their Sensitive Information and in preventing its misuse.

13.     Users of the Website have been harmed by Defendants' conduct, resulting in violations of the Federal Wiretap Act and CIPA. In addition to monetary damages, Plaintiff seeks

---

[1] Cal. Penal Code § 631(a).
[2] Cal. Penal Code § 638.51.

injunctive relief requiring Defendants to either remove the Tracking Tools from the Website or obtain appropriate consent from Users.

14.     Plaintiff's claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons. Plaintiff seeks relief in this action individually and on behalf of Users of the Website for violations of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e); Intrusion Upon Seclusion; violations of CIPA, Cal. Penal Code §§ 631 & 638; violations of the CLRA, Cal. Civ. Code §§ 1770 et seq.; violations of the UCL. Cal. Bus. & Prof. Code §§ 17200, et seq.; Common Law Fraud, Deceit and/or Misrepresentation; and Unjust Enrichment.

## PARTIES

15.     Plaintiff Rada is, and has been at all relevant times, a citizen of California who resides in Los Angeles, California. Plaintiff Rada used Defendants' Website to read articles and watch videos. Through Defendants' placement of Tracking Tools on the Website, users' personal information, including browsing activity and device identifiers, was tracked as soon as they visited the Website. For example, when Plaintiff Rada interacted with Defendants' Website on November 2, 2024, Plaintiff Rada's Sensitive Information was disclosed to the Tracking Entities. Plaintiff Rada began to receive unsolicited advertisements relating to the content she viewed. Plaintiff more recently visited the Website in connection with the investigation of this case and attempted to disable the Tracking Tools on the Website by using the cookie banner to decline all non-essential cookies. When she visited the Website in 2025, Plaintiff Rada attempted to use the cookie banner to disable the Tracking Tools, believing the Website's claim that she could disable marketing cookies. Despite Defendants' assertions, choosing to decline all non-essential cookies did not disable the Tracking Tools. The Website continued to track Plaintiff and intercept her

personal information, including browsing activity and device identifiers, after she chose to decline

the marketing cookies. Plaintiff Rada would not have used the Website had she known that her

Sensitive Information would be disclosed to unauthorized third parties.

16.     Versant Media, LLC is a Delaware limited liability company registered in New

York, with its principal place of business located at 229 West 43rd Street, New York, New York

10036. Versant Media, LLC has been engaged in the business of producing film and television

content for several decades. Defendant is the parent company of E! Entertainment Television,

LLC, which offers services allowing users to buy or rent live and on-demand digital movies and

television series, including DVD and Blu-ray collections.

17.     E! Entertainment Television, LLC is a Delaware limited liability company

registered to do business in New York, with its principal place of business located at 30

Rockefeller Plaza, New York, New York 10112.

## JURISDICTION AND VENUE

18.     The District Court for the Southern District of New York has jurisdiction over this

action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the

aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs;

and at least one Class Member is a citizen of a state different from at least one Defendant. This

Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under

the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e).

19.     This Court has personal jurisdiction over Defendants because Defendants derive

revenue in the State of New York, including Defendants' revenue generated from their

management over the Website, including the revenue sharing, advertising sales, etc. that

Defendants derive from the Website.

20.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because Defendants conduct substantial business operations in this District. In connection with the Website and the hosting of media accessible to Users, all claims originate and arise out of Defendants' business operations in this District. Lastly, venue is proper in this District because Defendants are subject to this Court's personal jurisdiction with respect to this action.

## COMMON FACTUAL ALLEGATIONS

## I.    Legislative Background

### A.    The Federal Wiretap Act

21.    The Federal Wiretap Act (the "Wiretap Act") was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications."[3]

22.    The Wiretap Act initially focused on government wiretapping. Congress later became concerned that technological developments such as "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing" had outpaced the statute.[4] Thus, in 1986, Congress amended the Wiretap Act through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions comparable to government intrusions.[5]

---

[3] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022).
[4] Senate Rep. No. 99-541, at 2 (1986).
[5] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022).

23.    The ECPA primarily focused on two types of computer services that were prominent in the 1980s: (i) electronic communications between users; and (ii) remote computing services like cloud storage or third-party processing of data and files.[6]

24.    Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person "intentionally intercepts . . . or procures any person to intercept . . . any . . . electronic communication" (2511(1)(a)), "intentionally discloses . . . To any other person the contents of any . . . Electronic communication, knowing or having reason to know that the information was obtained through the interception of a . . . Electronic communication in violation of this subsection" (2511(1)(c)), or "intentionally uses . . . The contents of any . . . Electronic communication, knowing or having reason to know that the information was obtained through the interception of a . . . Electronic communication in violation of this subsection (2511(1)(d)).

25.    The Wiretap Act initially concerned the government's use of wiretaps, but Congress became concerned that technological advancements such as "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing" were rendering the statute out of date. 18 U.S.C. §2511(2)(d).

26.    While Users communicated with Defendants on the Website through their browsing, the contents[7] of those communications were intercepted by third parties through the Tracking Tools.

---

[6] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).
[7] The contents of Plaintiff's and users' communications include: 1) search terms submitted to the site; 2) the location and contents of webpages visited by users; and 3) the PII discussed in Section III(A).

27. Defendants intentionally implemented the Tracking Tools on the Website to intercept Plaintiff's communications and transmit those communications to third parties for use in advertising and marketing activities.

28. Plaintiff neither knew of nor consented to the exposure of her legally protected communications with Defendants to third parties.

**B.     The California Invasion of Privacy Act**

29. CIPA was enacted in 1967 for the expressly stated purpose "to protect the right of privacy of the people of [California]."[8] The California legislators were concerned about emergent technologies that allowed for the "eavesdropping upon private communications," believing such technologies "created a serious threat to the free exercise of personal liabilities and cannot be tolerated in a free and civilized society."[9]

30. CIPA serves as California's counterpart to the Federal Wiretap Act; each statute addresses similar elements and targets similar privacy harms.

31. To protect people's privacy, legislators broadly protected communications being sent to or received from California.[10] Notably, California set out to prohibit (i) intentional wiretapping or (ii) willful attempts to learn the contents of communications, (iii) attempts to use or transmit information obtained through wiretapping, or (vi) aiding, agreeing with, employing, or conspiring with any person(s) to unlawfully do, permit, or cause the preceding three wrongs.[11]

---

[8] Cal. Penal Code § 630.
[9] *Id.*
[10] Cal. Penal Code § 631-32.
[11] *Mastel v.Miniclip SA,* 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021) (citing *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978)).

32.     CIPA also prohibits the installation of a "pen register" or a "trap and trace device" without first obtaining a court order.[12]

33.     "Pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."[13]

34.     "Trap and trace device" is defined as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."[14]

35.     In light of CIPA's purpose to protect Californians' privacy, "it seems very unlikely that the state Legislature meant to permit the installation and implementation of pen registers 'so long as those devices also record the contents of third parties' communications." *Gabrielli v. Haleon US Inc.*, No. 25-cv-02555-WHO, 2025 U.S. Dist. LEXIS 169503, at *34 (N.D. Cal. Aug. 29, 2025).

36.     Defendants did not obtain any court order authorizing the use of Tracking Tools, to record or capture Plaintiff's and Class Members' communications with the Website, and such use violates CIPA § 638.

---

[12] Cal. Penal Code § 638.51.
[13] *Id.* § 638.50(b).
[14] *Id.* § 638.50(c).

## II.    <u>The Website and the Tracking Tools</u>

37.    On the Website, Defendants utilized Tracking Tools, including those created by comScore, The Trade Desk, and ScoreCard (collectively, the "Tracking Entities"), to intercept and disclose Users' Sensitive Information without seeking or obtaining Users' consent.

### A.    The Trade Desk Pixel

38.    The Trade Desk is a demand-side platform ("DSP"), meaning it provides automation software to assist advertisers in purchasing advertisements.[15] The Trade Desk provides advertisement purchasers with software tools to manage, analyze, and optimize digital advertising campaigns across multiple channels and inventory sources.[16] As a DSP, The Trade Desk works with supply-side platforms ("SSPs"), which are used to manage the supply of advertising inventory for publishers and other entities that sell advertising space on their websites.[17] The Trade Desk is integrated with many supply-side platforms that rely on advertising spend generated by advertisers using The Trade Desk.[18]

39.    The Trade Desk offers technologies, products, and services designed to personalize the delivery of digital content to individual users.[19] As to personalized advertisements delivered to users, Jeff Green, Chief Executive Officer of The Trade Desk, described Trade

---

[15] *What is a demand-side platform (DSP)*, ADJUST, https://www.adjust.com/glossary/demand-side-platform/ (last visited Dec. 23, 2025).

[16] *Trackers: The Trade Desk (adsrvr.org)*, BETTER.FYI, https://better.fyi/trackers/adsrvr.org/ (last visited Dec. 23, 2025)

[17] *What is a Supply-Side Platform?*, PUBLIFT, https://www.publift.com/adteach/what-is-a-supply-side-platform (last visited Dec. 23, 2025).

[18] *Id*.

[19] *News Details: The Trade Desk Reports Fourth Quarter and Fiscal Year 2022 Financial Results; Announces $700 Million Share Repurchase Program*, THETRADEDESK: INVESTOR RELATIONS (Feb. 15, 2023) https://investors.thetradedesk.com/news-events/news-details/2023/The-Trade-Desk-Reports-Fourth-Quarter-and-Fiscal-Year-2022-Financial-Results-Announces-700-Million-Share-Repurchase-Program/default.aspx#:~:text=2022%20revenue%20increased%2032%25%20year%20over%20year%20to%20%241%2C578%20million (last visited Dec. 23, 2025).

Desk's Unified ID 2.0 marketing technology as follows: "[w]e will have effectively solved the identity matching challenge of the entire open internet on a scale well beyond anything cookies have ever accomplished, and all while providing consumers with much greater control over their privacy."[20]

40.    Among the tracking technologies offered by The Trade Desk and employed by the Website for tracking user behavior and collecting data for targeted advertising is the Trade Desk Universal Pixel ("TTD Pixel").[21] The TTD Pixel is enabled by placing TTD Pixel code within a website's code, which enables the capture of data on each page of the website and across multiple websites.[22] Trade Desk's TTD Pixel is designed to collect and transmit user data that marketers use to measure, manage, and optimize programmatic advertising campaigns.[23]

41.    The TTD Pixel, like other pixels, is a tracking tool that can be integrated with the Trade Desk's platform (the "Platform").[24] The TTD Pixel allows advertisers and site operators to "spend less time placing tags, gain more visibility into user data, and analyze reporting at a more granular level . . . all with the placement of a single tag."[25] The TTD Pixel collects information,

---

[20] Chris Kelly, *Trade Desk revenue up 24% as advertisers continue shift to CTV, retail media*, MARKETINGDIVE (FEB. 15, 2023) https://www.marketingdive.com/news/trade-desk-earnings-q4-ctv-retail-media/642825/ (last visited Dec. 23, 2025).

[21] *About The Trade Desk Universal Pixel*, TEALIUM, https://tealium.com/integrations/the-trade-desk-universal-pixel/ (last visited Dec. 23, 2025).

[22] *Universal Pixel*, THETRADEDESK, available at: https://www.lockheedmartin.com/content/dam/lockheed-martin/eo/documents/contact/TTD_UniversalPixel_Overview.pdf (last visited Dec. 23, 2025).

[23] Mason Widmer, *4 Vital Best Practices for Using The Trade Desk + A Top Tip*, GRAPESEED MEDIA (Dec. 12, 2023), https://grapeseedmedia.com/blog/trade-desk-best-practices/ (last visited Dec. 23, 2025)

[24] The Trade Desk platform refers to the Trade Desk's self-service technologies for buying and managing digital advertising campaigns across various channels and formats (the "Platform"). The Platform allows advertisers to use data to better target specific audiences using the TTD Pixel, along with other technologies. The Platform also provides real-time bidding, where advertisers bid on ad impressions, and can access insights into impressions, clicks, conversions, and audience engagement metrics. The Platform allows for cross-device advertising to smartphones, tablets, TVs, and desktop computers. Overall, the Platform provides advertisers with advertising capabilities, audience targeting, real-time bidding, data analytics, and control over their digital ad campaigns.

[25] *Universal Pixel*, THE TRADE DESK, available at: https://www.lockheedmartin.com/content/dam/lockheed-martin/eo/documents/contact/TTD_UniversalPixel_Overview.pdf (last visited Dec. 23, 2025).

including demographics, browsing behavior, and conversion events. The precise categories of information collected through the TTD Pixel in this case are described in further detail below.[26] The TTD Pixel is not limited to computer or browser-based browsing; it is capable of collecting information from mobile platforms, including how a user interacts with mobile applications, and specific details regarding the mobile device being used to access the content and the applications.[27]

42.    An advertiser or website operator that uses the Platform to run campaigns can leverage the TTD Pixel to collect data regarding how users interact across websites, mobile applications, television, and other technologies.[28]

### i.    The Trade Desk benefits from the Website's use of the TTD Pixel

43.    Integration of the TTD Pixel by Defendants provides benefits to The Trade Desk and the Website, as discussed below.

44.    The first benefit provided by the TTD Pixel to The Trade Desk is data collection. This data allows The Trade Desk to segment user information to create target audiences and track conversions.[29] For example, the TTD Pixel enables The Trade Desk to collect user data, including demographic information, browsing behavior, preferences, and interactions with websites.[30] This data is then sent to an SSP, which analyzes bids from multiple DSP, such as the Trade Desk, and

---

[26] *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS, https://audiencex.com/insights/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited Dec. 23, 2025).
[27] *Privacy and The Trade Desk Platform*, THETRADEDESK, https://www.thetradedesk.com/us/privacy (last visited Dec. 23, 2025).
[28] *Id.*
[29] *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS (Sept. 3, 2020) https://audiencex.com/insights/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited Dec. 23, 2025).
[30] Andy Pitre, *Ad Tracking: What It Is & How to Do It*, HUBSPOT: BLOG (Mar. 10, 2022) https://blog.hubspot.com/blog/tabid/6307/bid/7249/a-marketer-s-guide-to-tracking-online-campaigns.aspx (last visited Dec. 23, 2025).

facilitates the targeting of users based on their information.[31] The Trade Desk relies on this information for its business operations.

45.     The TTD Pixel also enables the Trade Desk to retarget users by creating lookalike audiences, as the TTD Pixel is "essentially [] just storing a group of people and information about them."[32] A lookalike audience is a group of individuals who are likely to be interested in a business because they share similarities with the business's existing customers.[33] By developing lookalike audiences, the Trade Desk enhances its ability to bid for advertising space from SSPs by identifying website users who are more likely to generate clicks or conversions based on shared characteristics with existing customers.[34]

46.     Finally, because Trade Desk's primary business model involves charging clients or advertising publishers a percentage of gross spending on the Trade Desk platform, improvements in advertising effectiveness increase Trade Desk's revenue. When advertising targeting efficiency improves by increasing advertising conversion rates (the rate at which clicks turn to sales)[35] advertisers are more likely to shift additional business to Trade Desk, resulting in increased revenue derived from ad sales.[36]

47.     On the Website, the TTD Pixel is configured to intercept Search Terms after a visitor submits those terms through the PSE and before the resulting search responses are

---

[31] *Programmatic Advertising: Your Guide to DMPs, DSPs, and SSPs*, GROWTH MARKETING GENIE, https://growthmarketinggenie.com/blog/programmatic-advertising-dmps-dsps-ssps/ (last visited Dec. 23, 2025).
[32] *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS (Sept. 3, 2020) https://audiencex.com/insights/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited Dec. 23, 2025).
[33] *Facebook Lookalike Audiences & When to Use Them*, BLACKBOX, https://blackboxdms.com/leveraging-your-data-how-to-build-facebook-lookalike-audiences-when-to-use-them/ (last visited Dec. 23, 2025).
[34] *Id*.
[35] *What is a conversion rate?*, ADJUST, https://www.adjust.com/glossary/conversion-rate/ (last visited Dec. 23, 2025).
[36] Trevor Jennewine, *How Does The Trade Desk Make Money?*, THE MOTLEY FOOL (Oct. 27, 2021) *available at* https://www.nasdaq.com/articles/how-does-the-trade-desk-make-money-2021-10-27 (last visited Dec. 23, 2025).

transmitted to and loaded on the visitor's device, as depicted below, thereby capturing the contents

of the user's search communications in transit:[37]



*Figure 2 – Inputting Search Terms into Search Bar results in TTD Pixel Intercepting the Search Terms*

### B.    Defendants utilize comScore's ScorecardResearch system to monetize users' Search Terms

48.    ScorecardResearch is a service of Full Circle Studios Inc., which is owned and

operated by comScore. ScorecardResearch describes itself as "a leading global market research

[company] that studies and reports on Internet trends and behavior."[38] ScorecardResearch states

that they "conduct[] research by collecting Internet web browsing data and then use[] that data to

help show how people use the Internet, what they like about it, and what they don't."[39] Scorecard

Research offers two ways to collect data for website operators and others wishing to utilize their

technology: (1) surveys; and (2) web tagging using the ScorecardResearch web beacons.[40]

49.    The ScorecardResearch web beacons are offered to users that wish to take part in

the company's market research.[41] A company that elects to take part in such market research

would place a ScorecardResearch web beacon into their website code, which allows comScore to

observe "browser-level."[42] The ScorecardResearch privacy policy states that its web beacons will

---

[37] Here, a test search was made using "blue jeans" as the Search Terms.
[38] *Welcome*, SCORECARD RESEARCH, https://www.scorecardresearch.com/ (last visited Dec. 23, 2025).
[39] *Id.*
[40] *Id.*
[41] Teodora Beleaga and Joanna Geary, *ScorecardResearch (ComScore): What is it and what does it do?*, THE GUARDIAN (Apr. 23, 2012) https://www.theguardian.com/technology/2012/apr/23/scorecardresearch-tracking-trackers-cookies-web-monitoring (last visited Dec. 23, 2025).
[42] *Id.*

collect information including: (1) when your browser visited a website; (2) what page of the website you visited; (3) the title of the web page; and (4) your IP address.[43] After being aggregated, the data collected by ScorecardResearch may be kept for up to 90 days, and can be used for analytical purposes indefinitely.[44] When asked if a website asks for detailed research regarding a topic, comScore says that "selected anonymous records relating to that specific site may be maintained indefinitely."[45]

50.    Scorecard intercepts the Search Terms after the Search Terms are entered into the PSE and sent to sb.scorecardresearch.com, as depicted below:[46]



*Figure 3 - A request is sent to Scorecard containing the Search Terms after inputting them into the Search Bar*

51.    When websites utilize ScorecardResearch web beacons, ScorecardResearch derives a principal benefit in the form of revenue earned through the commercialization and sale of the data collected through those beacons in its product offerings. As noted in its Privacy Policy, ScorecardResearch: "use[s] the collected information to prepare analyses and reports regarding digital consumption behavior that we share with other businesses and organizations which are our customers. These reports help our customers meet their business goals by providing them with a

---

[43] *Id.*
[44] Teodora Beleaga and Joanna Geary, *ScorecardResearch (ComScore): What is it and what does it do?*, THE GUARDIAN (Apr. 23, 2012) https://www.theguardian.com/technology/2012/apr/23/scorecardresearch-tracking-trackers-cookies-web-monitoring (last visited Dec. 23, 2025).
[45] *Id.*
[46] Here, a test search was made using "blue jeans" as the Search Terms.

better understanding of digital consumption behavior, trends, and consumer preferences."[47]

Scorecard further states that the information obtained is also used by comScore "whose data are

routinely cited by major media outlets such as The New York Times®, The Wall Street Journal®,

and CNN®. The data are extensively relied upon by some of the world's largest media companies,

advertisers, film studios, and its strategic partners include the most important players in the TV

and digital media and advertising ecosystem."[48]

52.    Indeed, this is further borne out by its Privacy Policy, which states that:

> This Privacy Policy explains how Versant Media, LLC and its affiliates ("**Versant Affiliates**") (collectively, "**Versant**" "**we**" or "**us**") collect, use, and disclose personal data from and about you when you use our websites, mobile applications, interactive TV applications, voice-activated skills, other digital services, connected devices, and off-line services that link to this policy, or if you otherwise interact with or engage in business with us.[49]

53.    Scorecard engages in data tracking and sharing for the purpose of improving its

products and services and assisting in the operation of its business.[50] Through the continued

collection and use of data obtained from website users, ComScore and ScorecardResearch are

able to strengthen and expand their product offerings. Those enhanced offerings permit further

investment in technologies designed to track user behavior and to commercialize that information

through sales to business partners.

54.    The information collected from the Website through ScorecardResearch tracking

technologies, and later sold, is important to both ScorecardResearch and comScore. It allows each

to offer products and information to their clients and to derive revenue from those offerings.

---

[47] *ScorecardResearch Privacy Policy*, SCORECARD RESEARCH, https://www.scorecardresearch.com/privacy.aspx (last visited Dec. 23, 2025).
[48] *ScorecardResearch Privacy Policy*, SCORECARD RESEARCH, https://www.scorecardresearch.com/privacy.aspx (last visited Dec. 23, 2025).
[49] Versant's Policy, https://www.versantprivacy.com/privacy#accordionheader2 (last Dec. 23, 2025).
[50] *Id*.

55.     ScorecardResearch tracking technologies provide Defendants with the ability to measure user behavior on and across the Website, identify behavioral trends, and use that information to more effectively deliver targeted advertising.[51] As stated in the ScorecardResearch Privacy Policy, its web tags and cookies assist websites in counting users who have visited and viewed a webpage or portions of a webpage.[52] More effective consumer targeting through the Website increases revenues for the Operator Defendants. Under standard online marketing practices, the Operator Defendants receive a share of advertising revenue generated from ad conversions.

### C.     Defendants Programmed the Website to Include the Tracking Tools

56.     Defendants voluntarily integrated the Tracking Tools into the Website's programming. The Tracking Tools consist of tools, content, or services provided by entities other than Defendants, including analytics services, advertising networks, and marketing platforms (the "Tracking Entities"), which are incorporated into the Website through embedded scripts, tags, pixels, stylesheets, or application programming interfaces ("APIs"). Defendants implemented and operated the Tracking Tools on the Website pursuant to commercial agreements with third parties.

57.     The Website causes users' devices to store and transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies contain unique identifiers that enable a website to recognize and distinguish individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and the Tracking

---

[51] Stelian Pilici, *ScoreCardResearch - What Is It And What Does It Do?*, MALWARETIPS (Mar. 21, 2023) https://malwaretips.com/blogs/scorecardresearch/ (last visited Dec. 23, 2025).
[52] *About*, SCORECARD RESEARCH, https://www.scorecardresearch.com/about.aspx (last visited Dec. 23, 2025).

Entities to identify the device making the request and to record a session reflecting the user's interactions with the Website.

58.    First-party cookies are placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendants' Website. First-party cookies are used to recognize users across repeated visits to the same website, to track on-site activity, and to generate marketing profiles based on that activity.

59.    Third-party cookies are placed by domains other than the Website's domain, such as the Tracking Entities. When a user's browser loads a webpage containing embedded third-party resources, the third party's scripts determine whether their cookies already exist on the user's device. If no such cookies exist, the scripts cause those cookies to be stored. These third-party cookies contain unique identifiers that allow third parties to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions, to build detailed and encompassing marketing profiles on users.

60.    Third-party cookies placed on users' devices during interactions with the Website intercept and record users' communications for the Third Parties, enabling real-time tracking and collection of users' personal information. The information collected includes browsing and visit activity, webpages viewed, URLs, titles, keywords, time spent on pages, navigation paths, session details, and referring URLs.

61.    This tracking captures detailed interaction and behavioral data, including links, buttons, forms, and other on-page elements selected by users, as well as information entered into search fields. The data includes location information and preferences, pages or videos viewed and interests, preferences, age, location, or other characteristics inferred from user behavior and content engagement. It also includes device and technical identifiers such as device type,

operating system, browser type, persistent user identifiers that enable recognition across sessions and websites, and approximate geolocation data derived from IP addresses or similar signals. Collectively, this information is referred to herein as "Sensitive Information."

62.    Cookies serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering user preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on user profiles; and (iv) social media integration. By enabling the collection, analysis, and dissemination of user data, cookies support Defendants' and their partners' marketing operations and contribute directly to revenue generation and advertising effectiveness.

63.    Defendants own and operate the Website, which provides access to entertainment content, including celebrity news, red carpet interviews, and related media content. When users interact with the Website by navigating pages, clicking links, or entering information, they transmit Sensitive Information directly to Defendants.

64.    Defendants intentionally integrated the Website with the Tracking Tools. As a result of that integration, users who visit the Website have first-party and third-party cookies placed on their devices and transmitted to Tracking Entities. Defendants control the Website's software code and the selection and loading of Tracking Tools, and therefore control whether cookies are placed and whether users' data is transmitted to Tracking Entities.

65.    In the Website's cookie consent and preference interface, Defendants state, in substance, that they use personal information for purposes including personalizing user experience and conducting analytics, marketing, and advertising.

66.     Your Privacy Choices interface further states that "targeting cookies" are used to analyze user behavior across websites and to present advertisements tailored to users' interests, and that information collected through such cookies may be shared with advertising platforms for the purpose of displaying relevant messages:

> "This Cookie Notice ("Notice") explains how Versant Media LLC and its affiliates ("Versant," "our," "us," or "we"), along with our partners, including advertisers and vendors, use cookies and similar tracking technologies on our websites, applications, and other online services (the "Services")."[53]

67.     In the Privacy Policy, Defendants provide additional disclosures regarding their use of cookies and state that Defendants and their affiliates collect or receive information concerning users' interactions with the Website.

> This Privacy Policy explains how Versant Media, LLC and its affiliates ("**Versant Affiliates**") (collectively, "**Versant**" "**we**" or "**us**") collect, use, and disclose personal data from and about you when you use our websites, mobile applications, interactive TV applications, voice-activated skills, other digital services, connected devices, and off-line services that link to this policy, or if you otherwise interact with or engage in business with us.[54]

## III.   Defendants Falsely Informed Users That They Could Opt Out of the Website's Use of Cookies

68.     When consumers located in New York visited the Website, the Website immediately displayed a popup cookie consent and privacy banner. The banner informed users that the Website is now a part of "Versant" and stated that "By continuing, you agree to our Terms," and that the Website's Privacy Policy applied, including the users' existing data. It further states that the Defendants and their partners "use tools on this site to provide the services,

---

[53] E! Entertainment's cookie consent preference window as it was available when Plaintiff opted out of cookies and tracking technologies on the Website.
[54] Versant's Policy, https://www.versantprivacy.com/privacy#accordionheader2 (last visited Dec. 23, 2025).

personalize your experience, and for analytics, marketing, and advertising," and presented users with the options to select "Your Privacy Choices" or to click "Continue."



*Figure 4 – Cookie Banner of E! Entertainment representing a "Your Privacy Choices" interface to accept or manage cookie settings"*

69.    Users who selected the "Cookie Settings" option were shown a cookie consent preferences window stating that users could control the collection, use, sale, or sharing of their personal information by adjusting toggles related to targeted advertising and the sale or sharing of personal information, consistent with applicable law.

70.    Upon expanding the section addressing the sale or sharing of personal information and targeted advertising, Defendants represented, in substance, that users could exercise their right to opt out of the sale or sharing of personal information by adjusting the toggle switch, and that doing so would result in the cessation of personalized advertising and the disclosure of users' personal information to third parties.



*Figure 5 - Cookie Settings representing users with an option of disabling the selling of user information and targeted advertising*

71.      E! Entertainment represents the targeted advertising system as an "opt-in" feature. The Tracking Tools are instead enabled by default, and the system operates as an opt-out mechanism that requires user action to disable tracking.



*Figure 6 - Screen capture as of Dec. 4, 2025, depicting the automatically enabled tracking system*

72.      Defendants' cookie banner and cookie settings led Plaintiff and similarly situated Website users to believe that they had disabled the sale or sharing of their information and all non-essential cookies. The banner and preference window also led users to believe that

Defendants would not allow third parties, through cookies or similar technologies, to access users' Sensitive Information in connection with the Website. This understanding included users' browsing history, visit history, Website interactions, user input data, demographic information, interests and preferences, device information, referring URLs, session information, user identifiers, and geolocation data once users exercised their control over the Tracking Tools.

73.     These representations were false. Defendants did not comply with users' expressed preferences. When users adjusted the toggles to opt out of the sale or sharing of personal information and to reject all non-essential cookies, users communicated that they did not consent to the placement or transmission of Tracking Tools, including non-essential cookies. Defendants nevertheless caused the Tracking Tools, including those cookies, to be placed on users' browsers and devices and transmitted to third-party entities together with user data.

74.     After users opted out of the sale or sharing of their personal information and declined all non-essential cookies, Defendants continued to place cookies on users' devices and transmit data to third parties. These actions resulted in the real-time collection of Website users' Sensitive Information. The information collected included browsing history, visit history, Website interactions, user input data, demographic information, interests and preferences, device information, referring URLs, session information, user identifiers, and geolocation data. Defendants continued transmitting user data despite users' efforts to protect their privacy.

75.     Certain aspects of the operation of cookies and Tracking Tools on the Website can be observed using website developer tools that record network traffic transmitted to and from a user's device while the user interacts with the Website.

76.    Network traffic logs generated through these tools reveal HTTP requests and transmissions between users' browsers and multiple third-party domains during users' visits to and interactions with the Website.



*Figure 7 – Screenshot depicting Developer Tool on user's browser to record and capture network activity*

77.    These network logs demonstrate that, even after users rejected non-essential cookies and opted out of the sale or sharing of their personal information, users' browsers continued to transmit numerous GET and POST HTTP requests to third-party domains and continued to use non-essential cookies to track users.

78.    Through these ongoing transmissions, Website users' Sensitive Information, including browsing history, visit history, interactions, inputs, session data, identifiers, and device level information, was disclosed to third parties. The Tracking Entities and Tracking Tools allow third parties to track users across websites and over time, correlate user behavior with other datasets, and compile detailed user profiles reflecting preferences, behaviors, demographics, and inferred characteristics. This information is monetized for advertising, analytics, and marketing purposes. The third-party code executed on users' browsers enables Tracking Entities that are separate from the parties to the communications to access and use users' Sensitive Information.

These third parties collect and use the intercepted communications for their own commercial purposes.

**IV.    Plaintiff Did Not Consent to Defendants' Sharing of Plaintiff's Sensitive Information**

79.    Plaintiff was unaware that the Tracking Tools intercepted her confidential communications with the Website.

80.    Plaintiff reasonably believed that her communications with the Website were made in confidence.

81.    Defendants provided no notice identifying who intercepted, recorded, or used the contents of those communications. Plaintiff therefore had no opportunity to provide consent to the interception of her search terms.

82.    The Trade Desk and ComScore, Inc. warn website operators that use of their tracking tools requires notice and valid consent before collecting protected consumer data or allowing third-party interception. Defendants agreed to those terms to deploy the Tracking Tools.

83.    Despite those requirements, Defendants provided Plaintiff with no notice that the Tracking Tools operated on the Website.

84.    Plaintiff therefore did not and could not consent to the collection or sharing of her data when visiting the Website, running searches, or requesting videos.

**V.    Plaintiff Has a Privacy Right in their Search Terms**

85.    Senator Leahy anticipated that technological developments would allow companies to build detailed profiles of consumers based on their habits.

86.    Communications between consumers and companies often appear private, but the contents of those communications are frequently shared.

87. Here, Defendants share consumer information, including search terms, with the Tracking Entities.

88. Search terms are private. This is especially true when searches are communicated in confidence or reasonably understood to be private. Searches may include sensitive or personal information, which heightens the need for confidentiality.

89. Users use search terms on the Website to locate articles and videos.

90. Courts recognize a reasonable expectation of privacy in URLs that disclose unique search terms or identify specific content viewed within a website.

91. As shown in Section IV, Defendants disclose such information through detailed URLs shared with third parties, including the Tracking Entities.

## INJUNCTIVE RELIEF OF DEFENDANTS' ONGOING WIRETAP VIOLATIONS

92. An actual and immediate controversy exists between Plaintiff and the putative Classes and Defendants. The parties have direct and substantial opposing interests. Defendants have violated, and continue to violate, Plaintiff's and Class Members' rights under the Wiretap Act.

93. Plaintiff is likely to succeed on the merits of these claims. Plaintiff is entitled to declaratory and injunctive relief.

94. Plaintiff lacks an adequate remedy at law to stop Defendants' ongoing violations of the Wiretap Act. Absent injunctive relief, Defendants will continue to infringe the privacy rights of Plaintiff and Class Members. Defendants will continue to disclose Sensitive Information. Injunctive relief serves the public interest.

95. E! Entertainment violated its obligations under the Wiretap Act. It deployed the Tracking Tools on the Website. It enabled third parties to access Users' Sensitive Information.

96.     Defendants provided no notice of the Tracking Tools. Defendants provided no disclosure regarding the scope of information shared. Defendants failed to seek or obtain consent for the use of the Tracking Tools.

97.     Ongoing violations present a continuing threat of injury that requires temporary, preliminary, and permanent injunctive relief.

## TOLLING

98.      Defendants' conduct tolled the statutes of limitations applicable to Plaintiff's and the Classes' claims, based on delayed discovery.

99.     Plaintiff and Class Members did not know, and could not have known, that the Tracking Tools disclosed their information and communications to third parties when they used the Website. Reasonable diligence would not have revealed Defendants' conduct.

100.    Defendants embedded the Tracking Tools into the Website without disclosure, providing no indication that communications would be shared with third parties.

101.    Defendants possessed exclusive knowledge that the Tracking Tools would disclose protected information and confidential communications. Defendants failed to disclose that interacting with the Website would result in disclosure of PII to third parties.

102.    The technical nature of the Tracking Tools prevented discovery of the full scope of Defendants' conduct. No disclosures or visible indicators alerted a reasonable consumer to interception or disclosure.

103.     Plaintiff and Class Members first learned of Defendants' conduct through investigation conducted in preparation for this action.

## CLASS ACTION ALLEGATIONS

104.    Plaintiff brings this action individually and on behalf of the following Classes:

**Nationwide Class**: All persons in the United States who visited the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "Class").

**California Subclass**: All persons in California who visited the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "California Subclass").

105.    Specifically excluded from the Classes are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

106.    Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Classes should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

107.    This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

108.    Numerosity (Rule 23(a)(1)): At this time, Plaintiff does not know the exact number of members of the aforementioned Classes. However, given the popularity of Defendants' Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

109.    <u>Typicality of Claims (Rule 23(a)(3))</u>: Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used the Website and had her Sensitive Information collected and disclosed by Defendants.

110.    <u>Adequacy of Representation (Rule 23(a)(4))</u>: Plaintiff will fairly and adequately represent and protect the interests of the Classes. Plaintiff has no interests antagonistic to, nor in conflict with, the Classes. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

111.    <u>Superiority (Rule 23(b)(3))</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class and Subclass Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class and Subclass Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

112.    <u>Commonality and Predominance (Rule 23(a)(2), 23(b)(3))</u>: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

a.    Whether Defendants collected Plaintiff's and the Class's Sensitive Information;

b.    Whether Defendants unlawfully disclosed and continue to disclose the Sensitive Information of Users of the Website in violation of the Federal Wiretap Act and CIPA;

    c.      Whether Defendants' disclosures were committed knowingly; and

    d.      Whether Defendants disclosed Plaintiff's and the Classes' Sensitive Information without consent.

113.    Information concerning Defendants' Website's data-sharing practices is available from Defendants' or third-party records.

114.    Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

115.    The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

116.    Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

117.    Given that Defendants' conduct is ongoing, monetary damages are insufficient, and there is no complete and adequate remedy at law.

**CAUSES OF ACTION**

**COUNT I - VIOLATION OF THE FEDERAL WIRETAP ACT**
**18 U.S.C. § 2510, et seq.**
**(On Behalf of Plaintiff and the Nationwide Class)**

118.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

119.    Plaintiff brings this cause of action on behalf of herself and all Class Members.

120.    The Federal Wiretap Act, codified at 18 U.S.C. § 2510 et seq. (the "Wiretap Act"), prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

121.    The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

122.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

123.    The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

124.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

125.    The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

126.    Defendants are a "person" within the meaning of the Wiretap Act.

127.    The Tracking Tools embedded on Defendants' Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

128.    Plaintiff had a reasonable expectation of privacy in her electronic communications with Defendants' Website, including her searches, browsing activity, and order-related

33

interactions, particularly where Defendants represented through their cookie banner, cookie-preference interface, and Privacy Policy that users could opt out of the sale/sharing of personal information and decline non-essential Tracking Tools.

129.    A reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on a commercial website are sensitive. Such communications include searches, menu selections, and order interactions. They convey the substance and meaning of the communication.

130.    Plaintiff, as a reasonable user, is entitled to assume that disclosure of the contents of her communications occurs lawfully and with consent. The opposite assumption would require users to expect routine violations of their privacy.

131.    Plaintiff reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of her electronic communications with Defendants' Website.

132.    During the relevant time period, Plaintiff's electronic communications with the Website were intercepted at the moment they were sent and transmitted to Tracking Entities without Plaintiff's consent. The intercepted information was monetized. Defendants combined that information with data collected about Plaintiff across the internet and used it for advertising, analytics, and marketing optimization.

133.    Interception occurred whenever Plaintiff interacted with the Website, including when she navigated webpages, used search or location features, viewed menu items, initiated an order, or otherwise communicated information to the Website through her browser.

134.    At all relevant times, Defendants acted knowingly, willfully, and intentionally. Defendants are a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on the Website and understood that doing so would result in the interception and

transmission of users' communications to Tracking Entities.

135.    Plaintiff was not asked to consent to the interception, recording, disclosure, or use of her electronic communications with the Website by the Tracking Entities. Plaintiff instead affirmatively declined non-essential tracking through Defendants' Your Privacy Choices interface.

136.    The unauthorized interception and use of Plaintiff's electronic communications by the Tracking Entities was only possible because Defendants knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

137.    As a direct and proximate result of Defendants' violations of the Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

a.    damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiff and any profits made by the intercepting parties as a result of the violations, or

b.    statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

c.    reasonable attorneys' fees and costs.

**COUNT II - INTRUSION UPON SECLUSION**
**(On Behalf of Plaintiff and the Nationwide Class)**

138.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

139.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against E! Entertainment.

140.    E! Entertainment intentionally intruded upon Class Members' solitude or seclusion in that it effectively placed the Tracking Entities in the middle of conversations including Sensitive Information to which it was not an authorized party.

141.    E! Entertainment's participation in the Tracking Entities' tracking and interception of Sensitive Information was not authorized by Plaintiff or Class Members.

142.    E! Entertainment's enabling of the Tracking Entities' intentional intrusion into Plaintiff's and Class Members' internet communications, including Sensitive Information, was highly offensive to a reasonable person in that they violated federal and state criminal and civil laws designed to protect individuals' privacy and against theft.

143.    Secret monitoring of Sensitive Information is highly offensive behavior.

144.    Wiretapping and the surreptitious recording of communications including PII is highly offensive behavior.

145.    Public polling on internet tracking has consistently shown that a majority of Americans believe it is important or very important to be "in control of who can get information" about them. Polling also shows that Americans do not want to be tracked without their consent and want to be in "control[] of what information is collected about [them]." The desire to control personal information increases when an individual is handling PII.

146.    Plaintiff and Class Members were harmed by E! Entertainment's facilitation of Tracking Entities' intrusion upon their seclusion. Plaintiff and Class Members are entitled to reasonable compensation, including disgorgement of profits derived from unlawful internet tracking.

## COUNT III - VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 631
### (On Behalf of Plaintiff and the California Subclass)

147.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

148.    Plaintiff brings this count on behalf of herself and all members of the California Subclass.

149.    CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

150.    The Ninth Circuit confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020). With respect to CIPA, the California Supreme Court has similarly concluded that the statute is intended to protect a person's communications "from a situation where the other person on the other end of the line permits an

outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

151.    The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

152.    Within the relevant time period, Plaintiff and members of the California Subclass communicated browsing history to Defendants, with the expectation of receiving video content provided by Defendants.

153.    During the relevant time period, Defendants acted without the consent of all parties to the communication. Defendants willfully read, or attempted to read or learn, the contents or meaning of Plaintiff's and California Subclass Members' electronic communications. The interception occurred contemporaneously with the communications' transit over wire, line, or cable. The communications were sent from or received at locations within California.

154.    The information collected by the Tracking Tools was not for the sole benefit of Defendants.

155.    Within the relevant time period, Defendants aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to intercept, collect, and disclose electronic communications in violation of CIPA § 631.

156.    Plaintiff and members of the California Subclass did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

157.    The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

**COUNT IV - VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 638**
**(On Behalf of Plaintiff and the California Subclass)**

158.   Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

159.   Plaintiff brings this count on behalf of herself and all members of the California Subclass.

160.   Under CIPA Section 638, a person "may not install or use a pen register or a trap and trace device without first obtaining a court order . . . ." Cal. Penal Code § 638.51.

161.   "Trap and trace device" means "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of the communication." *Id.* § 638.50(c).

162.   "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

163.   Section 638 of CIPA prohibits the installation or use of "a pen register or a trap and trace device without first obtaining a court order . . . ."[55]

164.   "Pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."[56]

---

[55] Cal. Penal Code § 638.51.
[56] *Id.* § 638.50(b).

165.    Given CIPA's purpose to protect Californians' privacy, "it seems very unlikely that the state Legislature meant to permit the installation and implementation of pen registers 'so long as those devices also record the contents of third parties' communications.'" *Gabrielli v. Haleon US Inc.*, No. 25-cv-02555-WHO, 2025 U.S. Dist. LEXIS 169503, at *34 (N.D. Cal. Aug. 29, 2025).

166.    California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…" § 638.51(a). No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendants.

167.    Defendants deploy the Tracking Tools on the Website and thereby use pen register and trap and trace processes. The Tracking Tools capture phone numbers, email addresses, routing, addressing, and other signaling information of Website visitors. The Tracking Tools identify the source of incoming electronic and wire communications to the Website.

168.    Defendants were not authorized by any court order to use pen register and trap and trace devices to track Plaintiff's and California Subclass Members' Sensitive Information.

169.    Defendants did not obtain consent from Plaintiff and Class Members before using pen register or trap and trace technology to identify users of their Website, and have violated Section 638.51.

170.    As a direct and proximate result of Defendants' conduct, Plaintiff's and California Subclass Members suffered losses and were damaged in an amount to be determined at trial.

## COUNT V - VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT
### Cal. Civ. Code §§ 1770, et seq. ("CLRA")
### (On Behalf of Plaintiff and the California Subclass)

171.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

172.    The CLRA prohibits any person from undertaking any "unfair methods of competition and unfair or deceptive acts or practices" in a transaction "that results in the sale or lease of goods or services to any consumer."

173.    Defendants are persons under the CLRA.

174.    Plaintiff is a consumer of Defendants' services under the CLRA, as Plaintiff used Defendants' Website.

175.    Defendants undertook deceptive acts or practices, in violation of the CLRA, by failing to disclose the presence of the tracking tools on the Website. Defendants violated section 1770(a) of the CLRA by '[m]isrepresenting the source, sponsorship, approval, or certification of goods or services.'

176.    By this failure to disclose, Defendants violated section 1770(a)(5) of the CLRA by '[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have.'

177.    By this failure to disclose, Defendants violated section 1770(a)(14) of the CLRA by '[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.'

178.    Defendants' failure to disclose was material to Website visitors such as Plaintiff. Visitors could have chosen a different website that did not use Tracking Tools. Visitors could have chosen a website that disclosed the presence of Tracking Tools and allowed them to be

disabled. Visitors could have chosen a website that requested consent before implementing Tracking Tools.

179.    As a direct and proximate result of Defendants' conduct, Plaintiff and California Subclass Members suffered losses and were damaged in an amount to be determined at trial.

## COUNT VI - VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL")
### (On Behalf of Plaintiff and the California Subclass)

180.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

181.    The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

182.    By actively and affirmatively misleading consumers by omitting to inform them of the tracking pixels on the Website in violation of the CLRA, Defendants have violated the unlawful prong of the UCL.

183.    By actively and purposefully installing a wiretap without a visitor's consent in violation of the Federal Wiretap Act and CIPA, Defendants have violated the unlawful prong of the UCL.

184.    By actively and purposefully installing a pen register and trap and trace device without a visitor's consent in violation of CIPA, Defendants have violated the unlawful prong of the UCL.

185.    Defendants failed to disclose the presence of the Tracking Tools on the Website. Defendants disclosed visitors' personal identifying information without knowledge or consent. Defendants disclosed visitors' information to Tracking Entities to build personal profiles without knowledge or consent. Defendants failed to disclose that they were wiretapping visitors'

communications with the Website. Through this conduct, Defendants violated the unfair prong of the UCL.

186.    Plaintiff has standing to bring claims against Defendants under the UCL. Plaintiff's information was tracked and recorded without consent. Plaintiff's data was used to build personal profiles for advertising purposes without consent.

187.    Plaintiff would have considered it important to the decision to visit Defendants' Website to know that her data was being tracked and recorded without her consent.

188.    Because of Defendants' UCL violations described above, Plaintiff suffered injury by losing control of her personal data and having her personal information tracked and recorded without her consent.

189.    As a direct and proximate result of Defendants' conduct, Plaintiff and California Subclass Members suffered losses and were damaged in an amount to be determined at trial.

## COUNT VII - COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION
### (On behalf of Plaintiff and All Class Members)

190.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

191.    Plaintiff brings this cause of action on behalf of herself and all Class Members.

192.    Defendants made affirmative representations to users through the cookie banner, Your Privacy Choices interface, and related disclosures. Defendants represented that users could opt out of the sale or sharing of personal information. Defendants represented that users could decline all non-essential cookies.

193.    Defendants represented that exercising those options would limit or prevent the deployment of non-essential Tracking Tools, including targeting and performance cookies, and

would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

194.    Defendants made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their Your Privacy Choices.

195.    These representations were false and misleading. After users, including Plaintiff, exercised their opt-out choices and declined non-essential cookies, Defendants continued to deploy Tracking Tools and continued to transmit user data to third parties.

196.    Defendants knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendants controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices.

197.    Defendants had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential tracking technologies based on user preferences, and Defendants could have implemented such measures.

198.    Defendants made misrepresentations with the intent to induce reliance by users, including Plaintiff, by reassuring them that they could meaningfully control tracking while Defendants continued to collect and transmit data for their own commercial benefit.

199.    Plaintiff and Class Members reasonably and justifiably relied on Defendants' misrepresentations by continuing to use the Website and by exercising the opt-out controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

200.    Plaintiff's reliance was reasonable because Defendants presented the cookie banner and cookie preferences interface as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

201.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff and Class Members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data.

202.    Defendants' conduct also resulted in Defendants obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon opt-out.

203.    Plaintiff and Class Members seek all available relief for Defendants' fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

## COUNT VIII - UNJUST ENRICHMENT
### (On behalf of Plaintiff and All Class Members)

204.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

205.    Plaintiff brings this cause of action on behalf of herself and all Class Members.

206.    Defendants obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiff's and Class Members' Sensitive Information, which Defendants then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

207.    Defendants retained those benefits under circumstances in which the information was collected and transmitted without valid consent. The information was collected and transmitted in breach of Defendants' representations to users. Defendants' retention of those benefits is unjust.

208.    Plaintiff and Class Members conferred these benefits on Defendants, and Defendants have been unjustly enriched at the expense of Plaintiff and the Class. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendants. Therefore, Plaintiff and Class Members are entitled to the relief set forth below

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

1. For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Classes and their counsel as Class Counsel;

2. For an order declaring the Defendants' conduct violates the statutes referenced herein;

3. For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

4. Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to requiring Defendants to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

5. An award of statutory damages or penalties to the extent available;

6. For damages in amounts to be determined by the Court and/or jury;

7. For pre-judgment interest on all amounts awarded;

8. For an order of restitution and all other forms of monetary relief;

9. An award of all reasonable attorneys' fees and costs; and

10. Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Dated: December 23, 2025

**LEVI & KORSINSKY, LLP**

By: _Mark S. Reich_
Mark S. Reich (MR-4166)
Gary Ishimoto *
Christopher V. DeVivo (5969787)
Michael N. Pollack (6173272)
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: gishimoto@zlk.com
Email: cdevivo@zlk.com
Email: mpollack@zlk.com

_Counsel for Plaintiff_

_*pro hac vice_ forthcoming